UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
CARLOS EVANS
                              Petitioner,

                                                      **MEMORANDUM & ORDER**

        -against-

                                                        06 CV 5919 (RJD)


BRIAN FISCHER, Superintendent,
        Sing Sing Correctional Facility,


                              Respondent.
----------------------------------------------------------x
DEARIE, Judge.

        Carlos Evans, serving a fifteen-year sentence on his 2002 convictions for burglary,

assault and criminal possession of a weapon, petitions for a writ of habeas corpus pursuant to

Title 28 U.S.C. § 2254, as amended by the Antiterrorism and Death Penalty Act of 1996,  Pub. L.

No. 104-132, § 104, 110 Stat. 1214 ("AEDPA").

        The focus of the petition is the admission at petitioner's trial of an unsworn, highly

detailed seven-page hearsay narrative, penned by the state's key trial witness, containing the

most damaging evidence and nearly the entirety of the state's case.  Admitted for its substance

without a limiting instruction, the document was touted by the prosecutor during summation and

furnished to the jurors, upon their request, at the outset of deliberations.  Petitioner claims that

the document's effect, as well as the state's objective in offering it, was essentially to supplant

the witness's poor performance on the stand, and to nullify his primary defense, which consisted

of a compelling impeachment of that testimony.  He argues that he was denied due process

because his conviction rests principally on this hearsay rather than the trial testimony.

        The state appellate court held that the trial court's decision to admit the hearsay document

was error in three distinct ways and not reconcilable with any extant evidentiary theory, but the appellate court nonetheless rejected petitioner's claim that the ensuing unfairness was of constitutional magnitude.  Under the unique circumstances and considerations addressed below, however, I conclude that the state appellate court unreasonably applied controlling Supreme Court holdings, which have long embodied the principle that the fundamental fairness guarantee of the Due Process Clause prohibits the state from obtaining a criminal conviction in the manner in which the State secured petitioner's.  As this Memorandum explains, the record reveals manifest trial error of enormously prejudicial consequences, indeed a very thwarting of the trial as a trial.  Mindful of the strict limits of my jurisdiction under AEDPA, I am compelled to conclude that the state appellate court's rejection of the due process claim on these facts was not merely error but objectively unreasonable, and I accordingly grant the petition.

## FACTUAL BACKGROUND

**Testimony of Aisha Walker**

I begin, as did the state at petitioner's trial, with the in-court testimony of the witness who authored the hearsay document whose admission ultimately transformed the proceedings.  That witness is Aisha Walker.[1]

Walker lived in a condominium complex in the Canarsie section of Brooklyn; Jimmy Omitogun lived in the same complex, in an apartment only a few doors away.  The two units were similarly configured duplexes, each with an upper-story window leading out to the same roof.

---

[1] Walker's testimony does not lend itself to ready summary; the account here includes certain facts omitted or denied on direct but later conceded on cross.

Walker first met Omitogun during the summer of 2001.  At that time, Walker was employed part-time as a dancer at Sweet Cherry, an adult club in Sunset Park.  At Omitogun's request, Walker agreed to perform private dance shows, for a fee, in Omitogun's apartment.  She visited him several times for this purpose and had occasion to admire his possessions.

On August 15, 2001, while Walker was at home socializing with a group that included petitioner, Hudson Merzier (a co-defendant), Anthony Foster (the other co-defendant) and one of Walker's Sweet Cherry co-workers, Foster suddenly remarked to the group that he was going to rob Omitogun.[2]  Foster then went to the roof to look through the skylight into Omitogun's apartment and commented upon its resemblance to Walker's.  He eventually enlisted Walker, Merzier, and petitioner to assist him with his plan to rob Omitogun.  Walker agreed to "[a]llow them to use [her] apartment" while petitioner "was basically just going to follow" Foster. Merzier initially did not want to participate, but eventually agreed to stay in Walker's apartment and serve as lookout, and also to drive a getaway vehicle.  Foster, however, was "the ringleader" and "[e]verything was his idea."  Walker, Merzier and petitioner never discussed weapons, but Foster said he had a gun and would use it if necessary.

Walker, Merzier and petitioner spent most of the next day (August 16, 2001) shopping together.  While on her way home, at around 9:30 p.m., Walker received a phone call from Omitogun, who asked her to round up girls from the club to dance for him and his friends. Walker told Omitogun that she had to start work in half an hour but would come by after her shift.  Walker was in the company of petitioner and Merzier when she received this call; she shared the contents of the conversation with them, but petitioner did not react.  Later, however,

---

[2] Walker stated that she had known Merzier for several weeks and had only met Foster that day, but she was inconsistent about whether she first met petitioner weeks earlier, when she met Merzier (her testimony on direct), or only that day, when she met Foster (her statement on cross).

when Walker, Merzier and petitioner were back in Walker's apartment, petitioner said that he was planning to rob Omitogun that night and asked Walker what time she thought Omitogun would be home.  Walker then left for the Sweet Cherry, while petitioner remained in Walker's apartment.

Shortly after she arrived at the Sweet Cherry, Walker telephoned Omitogun to ask whether he was going to pay for the other dancers he wanted her to bring.[3]  About an hour later, while she was still at the Sweet Cherry, Walker phoned Merzier, who reported that he was in her (i.e., Walker's) apartment, and that Foster and petitioner were in Omitogun's apartment "robbing him."

While Walker was heading home from the club between midnight and 1:00 a.m., she received a telephone call from Omitogun; he told her that he had just been robbed, and then he "put somebody else on the phone" who, in Walker's words, "threatened" her.  The voice said "he's not stupid" and that he "wants his money back along with his things."  Merzier and Walker then phoned each other several times; Merzier told Walker that he could not leave her apartment because the area was surrounded by police cars and helicopters, while Walker told Merzier she had been threatened and was heading to the nearest police precinct.

The prosecution also elicited from Walker, during direct, that she had previously made three statements to the police that were inconsistent with her trial testimony.  As to the first of the three, Walker testified that shortly after receiving the call from Omitogun telling her that he had been robbed, Walker went to the police station, where she asked Officer Hecht if she "could be escorted home because [she] was being threatened."  T. 72.  Walker decided to go to the police station both because she was afraid of "being busted" and because she "was threatened."

---

[3] There was no effort by the prosecution to connect this telephone call to Walker's role in the crime, or to reconcile the timing of the planned robbery of Omitogun's apartment with the timing of the planned private dancing in that same apartment.

T. 72.   When complaining to Hecht of the threat, Walker did not mention anything about the events that had occurred in Omitogun's apartment, nor did she say who had threatened her.  T. 72-74.  Because all of Hecht's officers were occupied with a homicide investigation (coincidentally, on the block where Walker lived), he told Walker to go somewhere else for a while and return at a later time.  T. 73.

Approximately an hour later, after spending time at her cousin's house around the corner from the police station, Walker returned to the precinct and made a statement to Detective Ahern, and sometime after that, having again left and again returned to the precinct, she told "something else" to Detective Rivera.  T. 75-77.   Walker "basically told [Rivera] that [she] had nothing to do with it, that [she] didn't leave anybody in [her] apartment.  And that was basically it . . . [that she] didn't have anything to do with it."  T. 76.   Walker also told Detective Rivera that petitioner and Foster "had discussed robbing" Omitogun.

The prosecution concluded the subject of Walker's prior statements by eliciting from her the fact that she also prepared a written statement:

> Q.     Now, you mentioned that you spoke to Detective [ ] Rivera, is that correct?
>
> A.     Yes.
>
> Q.     Did you write out your statement?
>
> A.     Yes, I did.   (T. 77).

The prosecution also asked Walker on direct, briefly, about only one feature of the written statement's contents:

> Q.     Now, you are saying that you don't remember mentioning [co-defendant Merzier] in your statement?
>
> *(Defense objection)*
>
> The Court:  You tell us what you said?
>
> A.     I said basically I just said [Merzier] was present.

Q.     You said he was present?

A.     Yes, he was there?

Q.     So, you did mention [Merzier's] name in your written statement, correct?

       (*Defense objection*)

       The Court:  Sustained, asked and answered.  (T. 77).

Finally, the prosecution brought out that Walker was herself eventually implicated in the crime and that, nearly a year after she gave her cluster of false statements to the police, indicted for her role.  Only a week before trial she formally entered a cooperation agreement, pursuant to which she testified against petitioner and Merzier in exchange for a five-year probationary sentence.  (Foster, the ringleader, absconded before trial, and Merzier was acquitted of all charges).

On cross-examination, the defense probed the substance of the several prior inconsistent statements that Walker had referred to on direct.  The examination exposed that Walker had lied at will, flagrantly and even sensationally, throughout her several conversations with the police in the hours following the crime.   Asked to elaborate upon her conversation with Officer Hecht, Walker stated that she had told Hecht that the reason she was threatened was that someone was robbed and had accused her (wrongly, according to her) of having been involved in it:

Q.     So, a woman comes to a police precinct, speaks to a police officer, tells them they have been threaten[ed], doesn't take your name, doesn't ask who threaten[ed] you and tells you come back some later time, that's your testimony?

A.     Yes, it is.  (T. 92-93).

Walker further admitted that she "did lie" (T. 93):

Q.     So you told the officer at that time whatever it was that suited your own best interest according to you at that moment, isn't that true?

A.     You can say that. (T. 93)

Walker also admitted that she "made a conscious decision to go back to the precinct an hour later and tell [ ] another false story," this time to Detective Ahern.  In speaking with Ahern, Walker "basically lied and said [she] had nothing to do with it" and "ha[d] no knowledge of who robbed [Omitogun]."  T. 98.    She also said that she "didn't leave anybody in her apartment" or give anyone permission to be there.  T. 98-99.  Walker eventually accompanied the police to her home and stood by as Merzier, Foster and petitioner were arrested for burglarizing *her* unit, while she denied that she even knew who they were.  T. 100-102.  Later, back at the precinct, Walker swore out a complaint to the same effect.  T. 103.  Walker agreed that throughout that episode she would "say and do whatever suit[ed her] interest at the moment," and that she did so "deliberately and consciously."  T. 100, 101.

On the subject of Walker's next statement, the testimony was as follows:

Q.      Now, this is all before you change your story again at about maybe some point later that day.  Do you remember you spoke again to another officer?  Now, this is the third officer by the name of Rivera?  Do you remember that?

A.      Yes.

Q.      And you gave a completely different version from version one and version two, isn't that correct?

A.      Yes.

Q.      And you did that because at that moment, that statement suited your interest, isn't that correct?

A.      *(Objection interposed and overruled).* Yes.

Q.      Whether it was partially true or totally untrue or police leading . . . it was irrelevant to you.  The only thing that that was relevant was suiting your own interest?

A.      Right.  It was more out of fear, but.

Q.     Well, you made a conscious decision.  No one force[d] you to make a statement to the police again later on that day after you had already made two prior statements. No once force[d] you to make it, right?

A.     *(Objection interposed and overruled.)*   Nobody force[d] me to make a statement.
                . . .

Q.     So you made a conscious decision on your own to again lie to the police, right?

A.     Yes.

Q.     And when you made this long statement to the police, which was not true, you didn't say anything at all about you being involved in this in any way, is that correct?

A.     Correct.

Q.     And that of course suited your own interest, right?

A.     Yes.   (T. 104-105).


The cross-examination also addressed Walker's decision to enter into a cooperation agreement (T. 107-111, 142-43), casting it as not as the source a new motive to fabricate but as *yet another* instance of Walker's general proclivity to lie to serve her own interests.  The pertinent portions of the examinations are as follows:

By counsel for petitioner:

Q.     So basically now what you are doing on the stand is you're avoiding five years imprisonment by telling another version of the story different from the three versions you have told before; is that correct?

A.     No, it is not. I'm telling the truth.

Q.     But whenever it was in your interest before you told whatever you felt like to get out of jail and this is getting you out of a jail sentence?

A.     Yes it is.  (T. 143).

By counsel for co-defendant Merzier:

Q.     So, it suits your interest to enter into a deal and testify at this trial against

[Merzier] and [petitioner]?

*(Objection interposed and overruled).*

A. Yes.

Q. Just like it suited your interest when you spoke to Officer Hecht, when it suited your interest when you talk[ed] to Detective Ahern, it suited your interest when you talk[ed] to Rivera and statements all of which were in fact not true?

*(Objection interposed and sustained).*  (T. 111-112).

The cross also covered the particulars of Walker's in-court account of the crime's planning and commission (T. 112-142), but did not inquire about the content of her written statement.

The prosecution conducted a brief redirect of Walker, but did not address the statement that Walker wrote for Detective Rivera.

**The Other Trial Evidence**

Through the testimony of the three victims and of the police officers who participated in the investigation, including a fingerprint analyst and a footwear print specialist, the prosecution established the following:

Just after midnight, on August 17, 2001, Jimmy Omitogun was at home in his condominium with his two friends, Oladipupo Wilson and Olawale Osinowo, when two men, armed and wearing bandanas over their faces, entered through the terrace.  The intruders forced the victims to the floor, face-down, and tied their hands and legs with telephone cord.  One searched the apartment while the other watched over and roughed up the victims.  Osinowo would eventually experience some vision impairment and require twelve facial stitches.

Responding to a 911 call from Omitogun's girlfriend, who had been on the telephone with Omitogun and had overheard part of the events, Officer Miceli interrupted the break-in.

-9-

The intruders fled up the apartment's internal stairway and disappeared, while Omitogun unbound himself and fled in the other direction, through the terrace and down to the street. Directed by Osinowo to the roof, Miceli found watches, $5,000 inside a Citibank envelope and a loose $100 bill, but no burglars.  He also observed footprints in the roof's moisture that suggested movement to and from Omitogun's and the neighboring apartment.  A search of that unit disclosed only its resident, asleep, with no relevant knowledge.  Outside the building, Miceli spoke with Omitogun, who reported that the assailants took his collection of watches (worth, he said, over $150,000) and $90,000 in cash.[4]

At approximately 6:00 a.m., a full six hours after the crime, police discovered petitioner, Merzier and Foster in Walker's apartment.  The roof that connected Walker's and Omitogun's apartments was not under camera surveillance or police monitoring between the time of the crime and the discovery of petitioner in Walker's unit, nor was there monitoring or surveillance of the street doorway leading to Walker's apartment.

After petitioner, Merzier and Foster were removed, Walker's apartment was left unsecured, although police believe Walker remained.[5]

_____

[4] Omitogun himself has a lengthy criminal history.  He admitted at trial that he was engaged in various credit card scams throughout the early 1990's.  In 1994, he pled guilty to credit card fraud and possession of stolen property and, after being released on bail, failed to appear for sentencing.  Arrested again a year later, Omitogun served 18 months in federal custody on similar charges.  He denied that the large sum of money stolen on the night in question related to drug dealing or illegal activity, instead offering an elaborate explanation of how he had obtained the money from the sale, back to a dealership, of his Mercedes Benz. Among other things, he claimed that after the dealership's check bounced, he insisted on being paid in cash, which the dealership provided in Citibank envelopes containing bundles of $5,000. He also claimed that $15,000 of the cash on hand was his "personal money" and that his business required him to "keep cash on hand all the time."

[5] To connect the non-Walker evidence with Walker's account: the arrival of the police at Walker's apartment was the visit prompted by Walker's complaint that she was threatened; the discovery of petitioner and the others resulted in their arrest for burglarizing Walker's apartment.

Two hours later, at around 8:00 a.m., the police returned and searched Walker's apartment.  The police found two 9 mm semiautomatics stashed under Walker's refrigerator, along with bandanas, gloves, and two baseball caps resembling those that the victims said the assailants had worn; a briefcase hidden in Walker's stove; and a backpack with the stolen items stowed away in a closet.

None of the victims could make an identification, each having testified only that petitioner bore the same general build as one of the intruders.  Fingerprints were lifted from Omitogun's living room and loft window but none matched petitioner's, and blood was found on some of the items discovered in Walker's apartment but not analyzed.  Foot impressions were lifted from certain surfaces around the crime scene and tested but the results were inconclusive.  Trace evidence expert Robert Schmidt testified that some of the impressions were too distorted for comparison with those of the Timberland boots that petitioner, Merzier and Foster were wearing, and other impressions were not properly preserved.  Nevertheless, Schmidt compared the impressions to the design, shape and size of the "stars and bars" pattern of the petitioner's and Merzier's boots, and opined that petitioner's right boot "could have produced" one of the impressions.  According to Schmidt, any other shoe with a similar pattern could have made the impression, and all Timberland boots, in addition to a "great deal" of the footwear Schmidt had studied over the years, also had the "stars and bars" pattern.  Schmidt also conceded that every article of footwear contains "random identifying characteristics" unique to that shoe or boot, but none of the unique features of petitioner's boots was found on the tested impressions.

The police testimony also revealed yet another episode of deceit by Walker that was not brought out during her examination.  According to Officer Miceli, Walker made a complaint to him similar to the one she made to Hecht; i.e., she complained that she was threatened but did

not disclose that she knew anything about the robbery giving rise to the threat.[6]  In addition, there was testimony that while at the precinct, Walker encountered Omitogun and engaged in a quarrel with him; Omitogun openly accused Walker of being involved in the robbery but she "played dumb."

**The Admission of Walker's Handwritten Statement**

Near the close of its case, the state sought to introduce, through Detective Rivera, the statement that Walker wrote at the police precinct—*i.e*, her writing up of what she had just told Rivera orally (and thus the last of the many Walker statements catalogued in this discussion).[7]

The distinctive nature of the document essentially speaks for itself and so I have included a copy as an addendum to this Memorandum.  Written in Walker's hand and bearing her dated but unsworn signature, the statement is a remarkable seven-pages in length.  One might reasonably characterize the writing as diary-like in the raw effusiveness of its voice, the specificity of its detail, and its overall comprehensiveness.  The narrative generally tracks many of the same events referenced in Walker's testimony, such as the shopping trip, the telephone call from Omitogun asking Walker to dance for his friends, and the sequence of telephone calls during and after the robbery, but in doing so the written narrative also tells a larger, more

---

[6] Walker spoke to Officer Miceli during either her second visit to the precinct (when she also made her untruthful statements to Ahern) or her third visit (when she made her untruthful statements to Rivera).

[7] With respect to Walker's making of the statement, Detective Rivera testified as follows:

> Q.    Did there come a time, later on that day, when you sat down with Ms. Walker again to re-interview her?
>
>  A.    Yes, later on that evening. . .
>
> . . .
>
> Q.    Did you ask Ms. Walker to make a handwritten statement?
>
> A.    Yes. (T. 820-21).

contextualized, and far more coherent story than Walker told on the stand.

At the same time, at the level of their actual contents, the written statement and Walker's testimony also differ materially from each other.  The most glaring difference, of course, is that Walker wrote the narrative while denying involvement in the burglary, and the entirety of the account it furnishes rests on and advances that premise, while her testimony as a cooperator rests on the opposite premise, *viz.,* her admission of culpability.

The written statement also furnishes several highly incriminating details that were not part of Walker's in-court account.  For example, in her testimony, Walker made reference to a meeting at which the robbery was initially planned, and she identified Foster as the person who, during that meeting, first hatched the idea of committing the crime; in her written statement, however, Walker describes an earlier conversation between Merzier and petitioner in which petitioner himself expresses a desire to rob Omitogun.  Similarly, in her testimony, Walker refers to phone calls she received from Merzier, immediately after the robbery, during which he tells her that he is hiding in the apartment because police have surrounded the area; in her statement, however, Walker attributes one of these incriminating phone calls to petitioner.

The state's offer of this extraordinary document spawned a lengthy and heated colloquy that saw the prosecution team straddle several alternative theories.  See T. at 821-836.  Initially, the state made the surprising claim that Walker's written statement—in its unredacted entirety— was a prior *consistent* statement that it was entitled to offer as rehabilitation in the face of Walker's impeachment by the defense.  In asserting the document's *consistency* with Walker's testimony, prosecutors apparently ignored the fact that, according to the testimony that they themselves elicited from Walker and Rivera, the statement was at least partly *inconsistent* with Walker's testimony; i.e., as recounted above, Walker admitted on direct that she had made

several statements to police that were inconsistent with her trial testimony, including the one to

Rivera, which she later "wr[o]te out" (T. 77).  Likewise, in asserting that the document had the

capacity to rehabilitate damaged trial testimony, prosecutors apparently overlooked Walker's

admission that she was lying throughout the time she made her series of statements to police.

The thrust of the defense position was that the prosecution was "try[ing] to somehow

bolster [its] own witness with [a] prior statement," and that the offer "was like taking prior Grand

Jury testimony and introducing it into evidence now."  T. 824.

In the course of the colloquy, the state eventually conceded that "[t]here are many

consistencies, as well as numerous inconsistencies," between Walker's testimony and the

statement (T. 823-23), but then took the position that the hearsay document should be admitted

*because* it was *both* consistent and *in*consistent with Walker's impeached testimony.  See T. 826-

28.  Inexplicably, the prosecution even asserted that the actual content of the document was not

relevant to admissibility:

> Defense:      Why don't you [the Court] read it and see what it is?
>
> Prosecution:  It is irrelevant what it is.
>
> Defense:      Your Honor…I guarantee if you read this statement there is no way in the
>               world, consistent with affording these defendants a fair trial, that you will
>               allow this statement into evidence [sic] of a witness that has already
>               testified at this trial.   It is a detailed seven-page statement.
>
> Prosecution:  …the substance of the statement is really not at issue . . . It does not matter
>               what the statement says.  Judge, if you look at the statement, if you
>               balance it, what is she telling the truth about and what is she telling a lie
>               about, it is irrelevant.  T.  829-30.

The trial court, however, did review the statement.  T. 830.

Although cross-examination exposed Walker to have been willing to lie at will, the

prosecution argued that "the crux of [the defense] cross examination was [that Walker] recently

fabricated another story," because "[s]he plead guilty and now has a reason to lie," and that her prior statement was therefore admissible to rehabilitate her.  T. 831-32.

The defense reiterated its position that "[t]his is classic improper bolstering of a witness that is completely prejudicial to the defendant.  There is no rule that allows this under any theory.  This attempts to prove the ultimate issues in this case through improper bolstering.  It is clearly a violation of [petitioner's] [c]onstitutional [r]ights."  T. 832.  Counsel further accused the prosecution of having "planned this," and the trial court agreed (telling counsel, "you are right,") but nevertheless ruled that, "to the extent that this witness's testimony at trial has been attacked as a recent fabrication, I'll allow this to go in as a prior consistent statement.  That's the exception to the rule against bolstering."  T. 832.

Despite the limited grounds for admission and the prosecution's concession that the document was partly inconsistent with Walker's testimony, there was no redaction of any of the inconsistent portions, nor was any limiting instruction requested or given either upon admission or at any point thereafter.  The entirety of this remarkably detailed, unsworn, un-cross-examined hearsay document was thus available to the jury to be considered as substantive evidence against petitioner; the court left the jury with no doubts on the matter:

> We're going to admit the actual wording of the document into evidence.  You'll
> be able to read it.  It is a seven-page, single space document.  I will let the officer
> just testify as to generally what it says, but, of course you will read the document
> itself if there is any question.

**The Prosecution's Summation**

Predictably, the prosecution capitalized on this windfall during summation, when it referenced the document repeatedly, cleverly picking and choosing between the hearsay document and Walker's in-court testimony in arguing its case to the jury.  See, e.g., T. 1048 ("Not only is it in the testimony . . . it's in the statement which is in evidence by Aisha"); T.

1068 ("This goes right back to Aisha's testimony.  Her statement that they took and gave . . . It's in her statement, she explains to you . . . It's in there.  Read it"); T.1069 ("These are details.  How can she make these details up.  In her statement, she describes the mind set . . . They had to wait it out.  It's in her statement").  Reaching a sort of crescendo, the prosecution told the jury:

> If you look at her statement, she repeats that in the statement . . . In her statement, she explains that . . . That's the testimony.  It's in the statement and you heard it from Aisha . . . It's in the statement.  You heard it from the statement . . . It's in the evidence. You can have it read back, and you can also read the handwritten statement given to Rivera.

The prosecution treated as substantive evidence portions of the written statement that address facts that Walker did not speak of in her live testimony.  For example, to explain the presence of a boot print found on the terrace of Omitogun's *neighbor's* apartment, the prosecution relied on a detail found only in the written statement—specifically, that Merzier told Walker that petitioner and Foster, in carrying out the burglary, had initially entered the wrong apartment.  The prosecutor expressly directed the jury to this detail in the written statement and emphasized its importance:  "[n]ow I'm not going to stand here and read her entire statement, but I'll going [sic] to ask you to read this statement.  There is a key point."  T. 1053.

**Deliberations**

In response to the jurors' request early in their deliberations, Walker's written statement was sent into the jury room.  Again, no limiting instruction was issued.

**Petitioner's Direct Appeal**

The Appellate Division was plainly troubled by the trial court's decision to admit Walker's statement, and in a cogent, factual analysis, concluded that no available theory could justify the ruling.  People v. Evans, 16 A.D.3d 517, 518-19 (2d Dep't), lv. app. denied, 4 N.Y.3d 886 (2005).  The unanimous panel specifically rejected each of the prosecution's three theories

for admission (one raised for the first time on appeal).  First, without deciding whether Walker's testimony was challenged on cross-examination merely as a recent fabrication or on the broader grounds urged by the defense, the Appellate Division concluded that, even assuming it was challenged only as a recent fabrication, admission of the document as a prior consistent statement was error because the document was "not made at a time when [Walker] had no motive to lie."  Evans, 16 A.D.3d at 518.  The document could not be used as rehabilitation, therefore, because Walker "had a motive to falsify at the time of the prior consistent statement as well as at the time of trial."  Id.  As the Court further explained, "[i]ndeed, Walker had a motive to falsify at the times she gave each of her statements to police officers, namely, to avoid complicity in the burglary and, hence, arrest, as well as at the time of trial."  Id.

Second, the Appellate Division rejected the prosecution's theory that the defense had "opened the door" merely by eliciting from Walker the fact that, in addition to the three versions she admitted making, she had also given another statement.  Id.  The Appellate Division specifically found that "[o]n cross-examination, [petitioner] carefully avoided any questions aimed at the content of the statement Walker gave to Detective Rivera." Id. at 519.[8]

Finally, the Appellate Division found that, "the statement was *not* consistent but, as the trial prosecutor proclaimed, it contained numerous inconsistencies," and that "[as] such, it was error to permit the prosecutors to impeach their own witness."  Id. at 518 (emphasis added).

The Appellate Division concluded, however, that the error "does not require reversal because there is no reasonable probability that [petitioner] would have been acquitted had the error not occurred."  Id. at 519.  The state appellate panel concluded that "[t]he evidence, other

---

[8] Although not mentioned by the Appellate Division, the record shows, as reviewed above, the prosecution made reference to Walker's written statement during its opening, and it was the prosecution who first elicited from Walker the fact that after speaking to Rivera, she later wrote down what she had told him.

than Walker's testimony, was overwhelming in establishing [petitioner's] culpability while, incidentally, confirming Walker's testimony implicating him." Id.

## DISCUSSION

### I.    AEDPA

Habeas relief is available only if a petitioner's conviction was obtained "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3).  Under AEDPA, the writ may not be granted "with respect to any claim that was adjudicated on the merits" in state court unless the state court adjudication "resulted in a decision that was contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. §2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d)(2).

In the fifteen years since AEDPA's enactment, in the course of construing the meaning of the pivotal statutory phrases "clearly established Federal law" and "an unreasonable application," the Supreme Court has been emphatic about the fact that AEDPA was intended to curtail the granting of habeas relief.  See generally Renico v. Lett, __ U.S. __, 130 S. Ct. 1855 (2010); Thaler v. Haynes, __ U.S. __, 130 S. Ct. 1171 (2010); Carey v. Musladin, 549 U.S. 70 (2006); Williams v. Taylor, 529 U.S. 362 (2000).  Indeed, only last year in Renico, Chief Justice Roberts (for the majority), while recognizing that "[t]he dissent [there] correctly points out that AEDPA itself never uses the term 'deference,'" explains that "[the Court's] cases have done so over and over again to describe the effect of the threshold restrictions in 28 U.S.C. § 2254(d) on granting federal habeas relief to state prisoners."  Renico, __ U.S. at __, n.1, 130 S. Ct. at 1862 n.1 (cataloguing Supreme Court decisions on the point) (quoting opinion of Stevens, J., 130 U.S. at

1876).

The Supreme Court has held that "'clearly established Federal law' under § 2254(d)(1) is the governing *legal principle or principles* set forth by the Supreme Court at the time the state court renders its decision," Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003) (emphasis added), and that "a legal principle is 'clearly established' within the meaning of [Section 2254] only when it is embodied in a holding of [the Supreme] Court," Thaler, __ U.S. at __, 130 S. Ct. at 1173, "as opposed to the dicta" of the Court's decisions, Taylor, 529 U.S. at 412, or the holdings of federal appellate courts.  Carey, 549 U.S. at 74.  See also Ryan v. Miller, 303 F.3d 231, 248 (2d Cir. 2002) ("In determining whether a right is clearly established under federal law as determined by the Supreme Court, we note that although the Supreme Court must have acknowledged the right, it need not have considered the exact incarnation of that right or approved the specific theory in order for the underlying right to be clearly established").

"A state court decision is 'contrary to' clearly established federal law 'if the state court applies a rule different from the governing law set forth in' the Supreme Court's cases or 'decides a case differently than' the Supreme Court has 'on a set of materially indistinguishable facts.'"  Richardson v. Sup't of Mid-Orange Correctional Facility, 621 F.3d 196, 202 (2d Cir. 2010) (quoting Bell v. Cone, 535 U.S. 685, 694 (2002)), cert. denied, 131 S. Ct. 1019 (Jan. 18, 2011).  "A state court decision is 'an unreasonable application of' clearly established federal law 'if the state court correctly identifies the governing legal principle from [the Supreme Court's] decisions but unreasonably applies it to the facts of the particular case.'"  Richardson, 621 F.3d at 202 (quoting Bell, 535 U.S. at 694).   "Unreasonable application" jurisprudence of course allows for the factual uniqueness of each case; as the Supreme Court has explained, "Section 2254(d)(1) permits a federal court to grant habeas relief based on the application of a governing

legal principle to a set of facts different from those of the case in which the principle was announced."  Lockyer, 538 U.S. at 76.  Accord Rivera v. Cuomo, __ F.3d __, 2011 WL 3447445, *3 (2d Cir. Aug. 9, 2011) ("A state court decision involves an unreasonable application of federal law if it correctly identifies the governing legal principle but unreasonably applies or unreasonably refuses to extend that principle to the facts of a particular case") (internal quotations and citations omitted).

"Unreasonable application" analysis appears to allow some room for consideration of non-Supreme Court law.  For example, Judge (now Justice) Sotomayor, writing for the Second Circuit in Serrano v. Fischer, 412 F.3d 292 (2d Cir. 2005), cert. denied, 126 S. Ct. 1357 (Feb. 21, 2006), explained that "nothing in AEDPA authorizes th[e] Court to ignore its own precedents in determining what constitutes a '[ ]reasonable application of Supreme Court law under §2254(d)(1)."  412 F.3d at 299 n.3.  Judge Sotomayor further explained that "even non-binding case law may be instructive in determining what constitutes a reasonable application of the law under § 2254(d)(1)" and that "[n]othing in § 2254(d)(1) precludes [the Circuit] . . . from looking to [its] own prior non-binding decisions or decisions of other courts for persuasive guidance." Id.  See also Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010) ("For purposes of 2254(d)(1), clearly established federal law consists of the holdings of the Supreme Court at the time of the state court decision; however, 'circuit precedent may be "persuasive" in determining what law is clearly established and whether a state court applied that law unreasonably.'") (internal citation omitted); Fischetti v. Johnson, 384 F.3d 140, 152 n.5 (3d Cir. 2004) ("As we have discussed, we look to non-Supreme Court cases not because the state court was obliged to rely on them, but as evidence of what courts would view as reasonable interpretations of Supreme Court law.").

Additionally, the Supreme Court has made emphatically clear that "unreasonable

application" is not synonymous with error: "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."  Schiro v. Landrigan, 550 U.S. 465, 473 (2007).  Cf. Gilchrist v. O'Keefe, 260 F.3d 87, 93 (2d Cir. 2001) (while "[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence") (quoting Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000)), cert. denied, 535 U.S. 1064 (2002).

As the Supreme Court recently emphasized,

> We have explained that "an unreasonable application of federal law is different from an incorrect application of federal law." . . . Indeed, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." . . . Rather, that application must be "objectively unreasonable." . . . This distinction creates "a substantially higher threshold" for obtaining relief than de novo review. . . . AEDPA thus imposes a "highly deferential standard for evaluating state-court rulings," . . . and "demands that state-court decisions be given the benefit of the doubt" . . .

Renico, __ U.S. at __, 130 S. Ct. at 1862 (all internal citations omitted).

Nevertheless, the Supreme Court has made clear that AEDPA did not dilute the writ's role as guardian of fairness.  As the Court explained, "[o]ver the years, the federal habeas corpus statute has been repeatedly amended, but the scope of that jurisdictional grant remains the same," and, critically, even post-AEDPA, "*errors that undermine confidence in the fundamental fairness of the state adjudication certainly justify the issuance of the federal writ*."  Williams, 529 U.S. at 375 (emphasis added).

The question before me, then, is statutory as much as it is constitutional: has petitioner

satisfied AEDPA?

Petitioner's claim is that the cumulative effect of the trial court's admission of Walker's hearsay statement under the unique facts and circumstances just described denied him the fundamentally fair trial guaranteed by the due process clause. There is no dispute that the state appellate court denied this claim "on the merits" for purposes of 2254.[9] Therefore, as the cited authorities make clear, to show that he is entitled to habeas relief, petitioner must do more than merely convince me, in my independent judgment, that a due process violation occurred at his trial, or that the state appellate court erred in overlooking such an error. Rather, petitioner must show that, when affirming his conviction notwithstanding the error committed by the trial court, the state appellate court *unreasonably applied clearly established federal law*. In today's habeas jurisprudence, this is *the* distinctive and dispositive AEDPA question. See Watson, 640 F.3d. at 503, 2011 WL 1843513, at *5. This means that petitioner must show, first, that the "legal principle or principles" on which he relies existed "at the time the state court render[ed] its decision," Lockyer, 538 U.S. at 71-72, and "[are] embodied in a [Supreme Court] holding." Thaler, __ U.S. at __, 130 S. Ct. at 1173; and second, that the state appellate decision not to reverse his conviction, when measured against the controlling legal principles, was "objectively unreasonable." Renico, __ U.S. at __, 130 S. Ct. at 1862.

---

[9] Petitioner's state appellate brief casts the arguments on evidentiary error and reversal-worthy unfairness as intertwined components of a single fair trial claim, i.e., that the trial court "violated [his] right to a fair trial by erroneously admitting the prior consistent statement of the prosecution's key witness," and in rejecting that claim, the Appellate Division's two-part decision (finding error but also concluding that reversal was not warranted) is reasonably understood as an adjudication on the merits of the due process claim. Watson v. Greene, 640 F.3d 501, 513, 2011 WL 1843513, at *10 n.6 (2d Cir. May 17, 2011); Jimenez v. Walker, 458 F.3d 130, 146 (2d Cir. 2006).

## II.    Clearly Established Federal Law: Due Process and Trial Fairness

The due process guarantee of trial fairness is a bedrock legal principle, undoubted and elementary, whose existence would seem to be self-evident.  See, e.g., Estelle v. Williams, 425 U.S. 501, 503 (1976) ("The right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment").  The principle is also clearly established Federal law for purposes of Section 2254, as numerous Supreme Court holdings pre-dating the state appellate decision in petitioner's case "embod[y]" the "legal principle," Thaler, 130 S. Ct. at 1173, in the context of due process challenges to the admission or exclusion of trial evidence.  For example, in Lisbena v. California, 314 U.S. 219 (1941), where the Court concluded that the evidence whose admission was challenged did not establish a deprivation of due process, the Court embodied in its holding the principle that "[t]he aim of the requirement of due process is not to exclude presumptively false evidence, but to prevent fundamental unfairness in the use of evidence whether true or false," and that "[a]s applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice."  Id.  at 236.  The Court further announced that, "[i]n order to declare a denial of [due process] we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial."  Id.  In Spencer v. Texas, 385 U.S. 554 (1967), where the Court ultimately rejected a due process challenge to the admission at trial, under Texas's recidivism statute, of evidence of a defendant's prior criminal acts, the Court began its legal discussion by reaffirming that "[c]ases in this Court have long proceeded on the premise that the Due Process Clause guarantees the fundamental elements of fairness in a criminal trial."  Id.  at 563-64.  In Dowling v. United States, 493 U.S. 342 (1990), the Court entertained a defendant's challenge, on due process grounds, to the admission under F.R.E. 404(b) of evidence relating to a crime that he

had been acquitted of committing; the Court framed the question before it as "whether the introduction of [a] type of evidence is so extremely unfair that its admission violates 'fundamental conceptions of justice'" and the "due process test of 'fundamental fairness.'" Id. at 352 (internal citation omitted).[10]   And in Estelle v. McGuire, 502 U.S. 62 (1991), where the cognizable habeas question was whether the admission of prior injury evidence to establish battered child syndrome in a state criminal trial deprived the defendant of due process, the Court "h[e]ld that [ ] the introduction of the challenged evidence . . . [did not] 'so infuse[ ] the trial with unfairness as to deny due process of law.'" Id. at 75 (citing Lisenba, 314 U.S. at 228).  See also Carey, 549 U.S. at 72 (citing Estelle for the proposition that "th[e Supreme] Court has recognized that certain courtroom practices are so inherently prejudicial that they deprive the defendant of a fair trial").

The Supreme Court has also specifically held, in Chambers v. Mississippi, 410 U.S. 284 (1973), that the cumulative effect of evidentiary trial errors under the unique facts and circumstances of a particular case can deprive a criminal defendant of the due process guarantee of a fair trial.  The Court there "conclude[d] that the exclusion of [certain] critical evidence, coupled with the State's refusal to permit [the petitioner] to cross-examine [another witness], denied him a trial in accord with traditional and fundamental standards of due process." Id. Noting that it was "establish[ing] no new principles of constitutional law," the Court explained that it "h[e]ld quite simply that under the facts and circumstances of th[at] case the rulings of the trial court deprived Chambers of a fair trial." Id. at 302-303.  See also Montana v. Egelhoff, 518 U.S. 37, 52-53 (1996) (explaining that "Chambers was an exercise in highly case-specific error

---

[10] Dowling was convicted of robbing a bank while wearing a ski mask; the trial court allowed testimony of a witness who stated that a similarly masked Dowling broke into her home two weeks after the bank robbery, even though Dowling had already been acquitted, in a separate proceeding, of the break-in.   The Supreme Court also rejected Dowling's separate claim that the Double Jeopardy Clause collaterally estopped the state from introducing the evidence.

-24-

correction," and that "the holding of <u>Chambers</u>—if one can be discerned from such a fact-intensive case—is . . . that erroneous evidentiary rulings can, in combination, rise to the level of a due process violation").

In addition, under <u>Chambers</u>, "[t]he right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations," 410 U.S. at 294, and so a due process violation occurs when trial error renders a criminal defense "far less persuasive than it might [otherwise] have been." <u>Id.</u> <u>See also</u> <u>California v. Trombetta</u>, 467 U.S. 479, 485 (1984) ("Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness. We have long interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense."); <u>Crane v. Kentucky</u>, 476 U.S. 683, 689 (1986) ("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment [citing <u>Chambers</u>] or in . . . the Sixth Amendment, [citations omitted], the Constitution guarantees criminal defendants a 'meaningful opportunity to present a complete defense.'") (quoting <u>Trombetta</u>, 467 U.S. at 485); <u>Strickland v. Washington</u>, 466 U.S. 668, 684-85 (1984) ("The Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment").

The Supreme Court test for whether evidentiary error rises to the level of a due process violation, despite being unavoidably tautological,[11] is both simple and formidable:  when a

_____

[11] <u>See e.g.</u>, <u>Chambers</u>, 410 U.S. at 302 (evidentiary errors violated due process because they "denied [defendant] a trial in accord with traditional and fundamental standards of due process"); <u>Estelle</u>, 502 U.S. at 75 (rejecting evidentiary-based due process claim because "the introduction of the challenged evidence . . . [did not] "so infuse[ ] the trial with unfairness as to deny due process of law").  <u>See also</u> <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974) (habeas relief for trial error appropriate only if the errors "so infected the trial with unfairness as to make the resulting conviction a denial of due process"); <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986) ("The relevant question [on habeas petitioner's due process claim] is whether the

habeas petitioner "contends that the introduction of [ ] evidence was unconstitutional because it failed the due process test of 'fundamental fairness,' . . . [t]he question [before the Court] is . . . whether the introduction of this type of evidence is so extremely unfair that its admission violates 'fundamental conceptions of justice.'" Dowling, 493 U.S. at 352 (quoting United States v. Lovasco, 431 U.S. 783, 790 (1977)). Accord Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir. 1998) (for 2254 purposes, although "[t]he introduction of unfairly prejudicial evidence against a defendant in a criminal trial is contrary to both state law . . . and federal law . . . [t]he introduction of improper evidence against a defendant does not amount to a due process violation unless the evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice'") (quoting Dowling, 493 U.S. at 352). See also Lisbena, 314 U.S. at 236 ("[t]he aim of the requirement of due process is . . . to prevent fundamental unfairness in the use of evidence whether true or false," and "[i]n order to declare a denial of [due process]" a court "must find that the absence of that fairness fatally infected the trial" and that "the acts complained of [are] of such a quality as necessarily prevents a fair trial").[12]

_____

[challenged] prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'") (quoting Donnelly, 416 U.S. at 643).

[12]   The Second Circuit's pre-AEDPA decision in Collins v. Scully, 755 F.2d 16 (2d Cir. 1985), requires brief attention.  Citing the Supreme Court's decision in United States v. Agurs, 427 U.S. 97, 108 (1976), the Circuit in Collins held that, "in order to prevail on a claim that an evidentiary error deprived the defendant of due process under the Fourteenth Amendment he must show that the error was so pervasive as to have denied him a fundamentally fair trial." 755 F.2d at 18.  The Court continued:  "When evidence is erroneously excluded the test for determining whether the ruling denied the defendant a fair trial is whether it would have created 'a reasonable doubt that did not otherwise exist.'" Id. (quoting Agurs, 427 U.S. at 112).  The Court then proceeded to explain that "[t]he question before [it] on th[at] appeal is whether a different test should be applied when evidence is erroneously *admitted*." Id. (emphasis in original).  Collins argued that there should be more exacting scrutiny when the jury has actually been exposed to wrongly admitted proof than when evidence has been excluded, but the Circuit rejected that view and held that the test should be the Agurs standard, which it reformulated for erroneous admission cases as follows: "the standard in our view should therefore be whether the erroneously admitted evidence, viewed objectively in light of the entire record before the jury,

was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." Id. at 19. "In short," the Court summed up, "[the erroneously admitted evidence] must have been 'crucial, critical, highly significant.'" Id. (quoting Nettles v.Wainwright, 677 F.2d 410, 414-15 (5th Cir. 1982).

Although a pre-AEDPA non-Supreme Court decision, Collins has come to define current habeas jurisprudence in the Circuit and this district, where it is routinely cited in decisions denying habeas relief as the standard for assessing whether evidentiary error rises to the level of due process violation. See, e.g., Hussain v. Woods, 2011 WL 1486555, at *10 (E.D.N.Y. Apr. 19, 2011) (NO. 08-CV-2375 CBA); Linton v. Bradt, 2011 WL 1252752, at *2 (E.D.N.Y. Apr. 4, 2011) (NO. 10 CIV. 4581 BMC); Flores v. Ercole, 2010 WL 3951048, at *4 (E.D.N.Y. Oct. 7, 2010) (NO. 09-CV-602 DLI).  The Circuit itself appears to have revisited the point only once, in an unreported memorandum decision, Smith v. Greiner, 117 Fed. Appx. 779 (2d Cir.  Nov. 8, 2004).  Affirming the district court's rejection of a habeas petitioner's due process challenge to the admission of evidence of his prior convictions, the Circuit wrote, "the standard for evaluating whether there has been a constitutional error resulting from an evidentiary error is whether such error was 'so pervasive as to have denied [the defendant] a fundamentally fair trial,'" and that "[t]he Court evaluates whether 'the erroneously admitted evidence, viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.'" Id. at 781 (quoting Collins, 755 F.2d at 18, 19).

I have several reservations about relying on Collins in a decision awarding habeas relief. First, although it is clearly announcing a constitutional standard, Collins is not a Supreme Court holding and, therefore, not "clearly established" law under 2254(d) for purposes of granting habeas relief.  (As also noted, although federal appellate decisions have a role in measuring whether Supreme Court law has been unreasonably applied, the holding in Collins purports to be *announcing* a constitutional standard, not applying one.)

Second, it is not clear that Collins's extension of Agurs to cases involving the erroneous admission of evidence is compelled by the language of Agurs or its progeny.  Agurs involved the prosecution's failure to disclose exculpatory evidence, and while the Court's discussion of the impact of that undisclosed evidence necessarily involved consideration of the impact of that evidence on the trial, the Court's holding is grounded in concerns with the prosecutorial duty to disclose.  I quote liberally from Agurs to make the point:

> On the other hand, since we have rejected the suggestion that the prosecutor has a constitutional duty routinely to deliver his entire file to defense counsel, we cannot consistently treat every nondisclosure as though it were error. It necessarily follows that the judge should not order a new trial every time he is unable to characterize a nondisclosure as harmless under the customary harmless-error standard. Under that standard when error is present in the record, the reviewing judge must set aside the verdict and judgment unless his "conviction is sure that the error did not influence the jury, or had but very slight effect." Unless every

Due process claims based on trial error require a careful delineation of the issue before the habeas court, for it is axiomatic that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions," Estelle, 502 U.S. at 67-68, and that "state-law violations provide no basis for federal habeas relief." Id. at 68 n.2. Instead, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Id. at 67.

Thus, while the habeas court necessarily engages with the state law question as a component of the broader due process inquiry, the Supreme Court's cases make clear that the

nondisclosure is regarded as automatic error, the constitutional standard of materiality must impose a higher burden on the defendant.

The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evince[sic] is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

Agurs, 427 U.S. at 111-113 (internal citation and footnotes omitted)

When the Supreme Court revisited Agurs in Kyles v. Whitney, 514 U.S. 419, 434 (1995), it reaffirmed that the Agurs "materiality" standard applies to Brady violations.

Third, there exist sound reasons why the tests for the wrongful exclusion and for the wrongful admission of evidence might not be identical; when exculpatory evidence is not disclosed and thus not admitted, the analysis, which asks what the effect of its disclosure or admission would have been, is necessarily hypothetical. When evidence is wrongly admitted, by contrast, there is an *actual* effect that can be assessed.

In any event, if Collins controlled this petition, the result would be the same: I would conclude, for the same reasons announced with respect to my discussion of Supreme Court law *infra* at pp. 47-53, that the state appellate court unreasonably applied the Collins/Agurs test.

state law and due process inquiries are independent.  In Estelle, for example, after stating, "We thus turn to the question whether the admission of the evidence violated McGuire's federal constitutional rights," 502 U.S. at 68, the Court began by considering whether the challenged evidence was admissible under California law.  Id. at 68-70.  The Court's affirmative answer to that question was dispositive of the due process inquiry in that case; there could be no violation of due process if there was not evidentiary error in the first place.  Id.  at 70.

In Chambers, by contrast, the Court engaged with the state evidentiary principles in a different manner.   The case involved, in part, Mississippi's common-law voucher rule, which prohibited a party from impeaching his own witness.  At trial, Chambers had called as a witness (because the state did not) an individual named McDonald who had made and later repudiated a written confession to the murder Chambers was charged with committing.  Applying the voucher rule, the trial court denied Chambers' request to treat McDonald as adverse and cross-examine him.  The Supreme Court did not find any violation of the state law, but concluded, instead, that the state rule itself was fundamentally unfair as applied in petitioner's trial because it impaired his ability to put on his defense.  410 U.S. at 295-98.  Chambers also challenged the trial court's refusal, on hearsay grounds, to allow him to call three witnesses who would have testified that McDonald had confessed to them.  Citing a wide array of federal, state and scholarly authorities, the Supreme Court engaged in a plenary evidentiary analysis, concluded that the trial court committed evidentiary error, and found that error to be (in part) fundamentally unfair because of the importance of the excluded testimony to Chambers' defense.  410 U.S. at 298-302.[13]  See also Dunnigan, 137 F.3d at 125-27 (in assessing for 2254 purposes whether "[t]he introduction of improper evidence against a defendant . . . amount[s] to a violation of due process" under the

---

[13] The Court specifically found that McDonald's out-of-court statements should have been admitted because they qualified as declarations against interest and were made, and being offered, under circumstances providing assurances of their reliability.   410 U.S. at 299-301.

Supreme Court's <u>Dowling</u> test of extreme unfairness, Second Circuit engages in plenary discussion of certain evidentiary rulings in jurisdiction-neutral terms, without citation to federal or state authorities).  Cf. <u>Davis v. Strack</u>, 270 F.3d 111, 123 (2d Cir. 2001) ("What due process requires will often depend on what state law is. . . . Once states have promulgated laws to define criminal conduct, however, federal due process protects a defendant from conviction unless he is shown in a fair proceeding to have violated those laws.  Thus, while we may not grant habeas relief for a 'mere error of state law,' a finding that the petitioner was erroneously deprived of [a trial ruling] to which he was entitled under state law is the first step in the determination whether that error violated the petitioner's federal due process rights.") (internal citations omitted); <u>Jones v. Cain</u>, 600 F.3d 527, 536 (5th Cir. 2010) (affirming district court's granting of habeas relief because of erroneous evidentiary rulings of trial court, and explaining that, although "[t]he State is correct that federal courts sitting in habeas do not review state courts' application of state evidence law," the district court "correctly asked whether the state court's application of state evidence rules violated Jones's constitutional rights . . . Regardless of how a state court applies state evidence rules, a federal habeas court has an independent duty to determine whether that application violates the Constitution. . . . Adoption of the State's argument would immunize constitutional error from review when the error is related . . . to a state evidentiary ruling. That is not the law.") (internal citations omitted).

## III.  The Evidentiary Question and Trial Unfairness

### A.  Legal Standards

The questions of evidentiary and due process error are virtually inseparable in this case. As my ensuing review of the relevant authorities makes clear, the features of evidence law involved on this petition embody elemental common-law concepts, not confined to New York's

or any one jurisdiction's boundaries, that are considered fundamental to the basic functioning of a trial.[14]  Indeed, the authorities delineating the applicable evidentiary principles do so in a manner that underscores the seriousness of errors involving these principles and the unfairness such errors may create.  Again, it is not mere evidentiary error that focuses the Court's attention; i.e., this Court is not concerned merely with whether some hearsay statement or other error has crept into the record, but with whether any such errors rendered the trial fundamentally unfair.  But the analysis must begin with the evidentiary question.

As the trial record and the Appellate Division's analysis show, the "single" ruling of the trial court was in fact a serious transgression of several distinct evidentiary precepts—including the so-called "pre-motive" requirement for the admission of prior consistent statements and the rule governing the impeachability of one's own witness through a prior inconsistent statement, discussed separately below—but the overarching principle is the basic prohibition against the obtaining of a conviction by hearsay.

As the Supreme Court in Chambers recognized, "perhaps no rule of evidence has been more respected or more frequently applied in jury trials than that applicable to the exclusion of hearsay."  410 U.S. at 302.   "The hearsay rule," the Court explained, "has long been recognized and respected by virtually every State" and "is based on experience and grounded in the notion that untrustworthy evidence should not be presented to the triers of fact."  Id. at 298.  "Out-of-court statements," the Court understood, "are traditionally excluded because they lack the

_____

[14] I also note that despite the Appellate Division's rejection of each of the arguments the state advanced to support the trial court's decision to admit Walker's hearsay narrative, the state continues to press, here on habeas, its position that the statement was properly admitted.  I find myself in general agreement, however, with the Appellate Division's determination that the evidentiary ruling was erroneous in several distinct ways and in fact irreconcilable with any extant evidentiary principle. I draw here, however, upon a broader set of authorities than did the Appellate Division to underscore the seriousness of the error that occurred at petitioner's trial.

conventional indicia of reliability: they are usually not made under oath or other circumstances that impress the speaker with the solemnity of his statements; the declarant's word is not subject to cross-examination; and he is not available in order that his demeanor and credibility may be assessed by the jury." Id.

It is precisely because of their suspect reliability that the *corroborative* use of out-of-court statements—i.e., to rehabilitate impeached in-court testimony—is, although permitted, subject to especially strict regulation.  As the New York Court of Appeals has explained:

> Generally, the testimony of a witness may not be corroborated or bolstered by evidence of prior consistent statements made before trial.  The reason, of course, is that an untrustworthy statement is not made more trustworthy by repetition. There is a recognized exception to the rule, however, which permits evidence of prior consistent statements when the witness' testimony is assailed as a recent fabrication.  Mere impeachment by proof of inconsistent statements does not constitute a charge that the witness' testimony is a fabrication.  But if the cross-examiner seeks to impeach the witness by evidence tending to show that his testimony is of recent invention, given under motives of interest or bias, the party calling the witness, in order to rebut that inference, may show that the witness made statements similar to his trial testimony at some earlier time when he was free from the alleged bias.  An impeached witness cannot be rehabilitated by his antecedent consistent statements unless the cross-examiner has created the inference of, or directly characterized the testimony as, a recent fabrication.  If he does, then prior consistent statements which antedated the existence of the motive to fabricate alleged at trial may be admitted, not to prove or disprove any of the facts in issue, but to aid in establishing the credibility of the witness.  If the same motive to falsify which exists at the time of the testimony existed at the time the prior consistent statement was made, the statement remains inadmissible.

People v. McClean, 69 N.Y. 2d 426, 428 (1987) (internal citations omitted).

Leading commentators express the rationale of the rule similarly.  See generally Barker, Robert A. and Alexander, Vincent C., *New York Practice Series – Evidence in New York State and Federal Courts* (Oct. 2008), 5 N.Y. Prac., Evidence § 6:41 (Prior Consistent Statements).

As these authorities explain, "[i]f the witness is charged with giving false testimony as the result of corrupting influences or a recently-developed motive, . . . proof that the witness said the same thing before any such factors came into play naturally tends to rebut the inference of fabrication at trial." Id.  In order to qualify as legitimate rehabilitation of testimony impeached as a recent fabrication or as the product of particular corrupting influences, the statement "must have been made before the motive to fabricate existed or before [the] corrupting influences [elicited during the impeachment] were brought to bear." Id.  As the authorities further explain, "[t]his restrictive approach is premised on the notion that prior consistent statements are not particularly probative of credibility where impeachment of the witness is general in nature, such as [bias], bad character for truthfulness or prior *in*consistent statement." Id. (emphasis added).  When impeachment is of this general nature, the introduction of the prior consistent statement may simply be the "[r]epetition of a lie," which of course "does not increase a witness' veracity." Id.

The same general rule is followed in federal courts through Federal Rule of Evidence 801 (d)(1).  The text of the rule provides, in pertinent part, that the prior out-of-court statement of a trial witness is admissible if the statement is "consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." Fed. R. Evid. 801(d)(1).  The Supreme Court has explained that this rule "embodies the common law pre-motive requirement" that was "the prevailing . . . rule for more than a century before the adoption of the Federal Rules of Evidence." Tome v. United States, 513 U.S. 150, 156 (1995).   Thus, the Court in Tome held that, like the common law rule, FRE 801(d)(1) similarly "permits the introduction of a declarant's consistent out-of-court statements to rebut a charge of recent fabrication or improper influence or motive *only* when those statements were made *before* the charged recent fabrication or improper influence or

-33-

motive." <u>Id.</u> at 167 (emphasis added).  The Court further explained:

> admissibility . . . is confined to those statements offered to rebut a charge of "recent fabrication or improper influence or motive," the same phrase used by the Advisory Committee in its description of the "traditiona[l]" common law of evidence, which was the background against which the Rules were drafted.  Prior consistent statements may not be admitted to counter all forms of impeachment or to bolster the witness merely because she has been discredited. . . . [FRE 801] speaks of a party rebutting an alleged motive, not bolstering the veracity of the story told.
>
> This limitation is instructive, not only to establish the preconditions of admissibility but also to reinforce the significance of the requirement that the consistent statements must have been made before the alleged influence, or motive to fabricate, arose.

<u>Id.</u> at 157-58 (internal citations omitted).[15]

In short, the pre-motive requirement ensures that the rehabilitation is tailored to the nature of the impeachment. <u>See</u>, <u>e.g.</u>, E. Cleary, McCormick on Evidence § 49, p. 105 (2d ed. 1972) ("When the attack takes the form of impeachment of character, by showing misconduct, convictions or bad reputation, it is generally agreed that there is no color for sustaining by consistent statements. The defense does not meet the assault.") (footnote omitted).

Notably, the Supreme Court reversed the aggravated sexual assault conviction of Matthew Tome because of the erroneous introduction at Tome's trial of prior consistent statements that did not satisfy the pre-motive requirement.  The facts and result are instructive. The alleged victim, age 6 ½ at the time of trial, did not prove to be the strongest of witnesses for the prosecution.   On direct, she testified in a series of one- and two- word responses to leading prosecution questions, and when cross-examined about the allegations, "was reluctant at many

---

[15]   The difference between the federal and state rule, not relevant here, is that under the federal rule, an out-of-court statement satisfying the rule's admissibility requirements is "not hearsay," Fed. R. Evid. 801(d), and so qualifies as substantive evidence, whereas under state law, a statement satisfying the pre-motive requirement is "admitted, not to prove or disprove any of the facts in issue, but to aid in establishing the credibility of the witness."  <u>McClean</u>, 69 N.Y. 2d at 428.

points to answer." <u>Tome</u>, 513 U.S. at 153.  The trial judge "expressed his concerns with [her]

examination," noting that "there were lapses of as much as 40-55 seconds between some

questions and the answers" and that the child eventually "seemed to be losing concentration." <u>Id.</u>

at 153-54.  The defense sought to establish that the allegations against the defendant, the victim's

father, were concocted to deprive him of custody.   In rebuttal, the government called six

different witnesses, including the child's babysitter, mother, social worker and pediatricians, who

each testified to statements the victim had made to them implicating Tome; in allowing the out-

of-court statements, the trial court accepted the government's assertion that the statements

rebutted the implicit charge that the child's testimony was motivated by a desire to live with her

mother and so were admissible under FRE 801(d)(1).

       The government did not dispute that the out-of-court statements were made "after [the

victim's] alleged motive to fabricate arose," <u>id.</u> at 155 (its position was that the rule did not

require as much), and so the Court readily concluded that the "conditions of admissibility [for the

out of court victim statements] were not established." <u>Id.</u> at 167.  But, the Court also reversed

Tome's conviction because of the erroneous evidentiary ruling.  The Court explained its concern,

"especially in criminal cases," that by improperly allowing the "introduction of prior statements

as substantive evidence to rebut every implicit charge that a witness' in-court testimony results

from recent fabrication or improper influence or motive, the whole emphasis of the trial could

shift to the out-of-court statements, not the in-court ones." <u>Id.</u> at 165.  The Court also believed

that "[Tome's] case illustrates the point." <u>Id.</u>   As the Court explained, the result of the

erroneous evidentiary ruling was that, "the Government was permitted to present a parade of

sympathetic and credible witnesses who did no more than recount [the alleged victim's] detailed

out-of-court statements to them." Id.[16]

The Second Circuit, both before and after Tome, has likewise enforced the pre-motive

requirement and reversed criminal convictions obtained through the introduction of purportedly

"consistent" out-of-court statements, admitted for their substance, that did not satisfy this

important condition of admissibility.  A significant post-Tome example is United States v. Al-

Moayad, 545 F.3d 139 (2d Cir. 2008), where the defendants were convicted of conspiracy to

provide and attempting to provide material support to a designated terrorist organization and

related charges.  The government had relied heavily in its investigation on the assistance of

confidential informant Mohammad Al-Anssi; the government did not call Al-Anssi but the

defendants did, in furtherance of their trial defense that they were entrapped by Al-Anssi.  As the

Second Circuit's decision notes, the defense "elicited significant impeachment testimony from

[Al-Anssi], including admissions of his heavy indebtedness, financial difficulties, and his

attempts to obtain large sums of money from the FBI in exchange for information."  Al-Moayad,

545 F.3d at 154.  Defense counsel also exposed certain areas in which Al-Anssi's assertions

against the defendants were speculative or unsupported by any document.  Id. at 154-55.  The

trial court allowed the government to introduce Al-Anssi's handwritten notes memorializing

much of the information he gathered while working undercover.  The trial court did not specify

the ground for their admission, but the government argued, over the defense objection, that the

notes were prior consistent statements admissible because of the defense impeachment of Al-

_____

[16]As the Court further explained, "[a]lthough those statements might have been probative
on the question whether the alleged conduct had occurred, they shed but minimal light on
whether [the victim] had the charged motive to fabricate." Id.  The Court did recognize that "in
some cases it may be difficult to ascertain when a particular fabrication, influence, or motive
arose," but noted, as the government had conceded, that "a majority of common-law courts were
performing this task for well over a century." Id. at 165-66.  The Court further noted that
"[e]ven under the [contrary view], the thing to be rebutted must be identified, so date of its origin
cannot be that much more difficult to ascertain." Id. at 166.

Anssi.

On the evidentiary question, the Second Circuit, citing Tome, squarely held that FRE 801(d)(1)(B) "includes a fundamental temporal requirement: [t]he statement must have been made before the declarant developed an alleged motive to fabricate." Al-Moayad, 545 F.3d at 167 (internal quotation and alteration omitted). The Court then concluded that,"[i]f the district court admitted Al-Anssi's notes for their substance as prior consistent statements, it erred in doing so," because "Al-Anssi created the notes *after* a significant motive to fabricate arose, namely the large amount of money he expected and was paid to furnish information to the FBI." Id. (emphasis added).

As for the unfairness caused by the evidentiary error, the Court engaged in a sweeping analysis that interweaves due process and harmless error law, citing, *inter alia*, Chambers and Taylor v. Kentucky, 436 U.S. 478 (1978), where the Supreme Court found that that "the cumulative effect of the potentially damaging circumstances of th[e] case violated the due process guarantee of fundamental fairness," id. at 487 n.15, as well as Kotteakos v. United States, 328 U.S. 750 (1946), which announced the now familiar standard applied in federal appeals to determine whether trial error warrants reversal. Under Kotteakos, an error is deemed harmless unless it "had [a] substantial and injurious effect or influence in determining the jury's verdict." Id. at 776. Kotteakos further instructs that "if one cannot say, with fair assurance, . . . that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." Id. at 765.

The Al-Moayad Court concluded:

> We have found that "[e]ven if an appellate court is without doubt that a defendant is guilty, there must be a reversal if the error is sufficiently serious." . . . [T]he admission of Al-Anssi's notes as substantive evidence was a serious error. The notes contained

> much of the government's strongest, most direct evidence
> regarding Al-Moayad's predisposition and significantly buttressed
> Al-Anssi's trial testimony, which had been impeached by the
> defendants.  As we have already noted, the government cited the
> notes repeatedly in its main and rebuttal summations, both as
> corroboration and as independent evidence of Al-Moayad's guilt
> . . . For these reasons, we cannot be "sure that the [erroneous
> admission of the notes as substantive evidence] did not influence
> the jury, or had but very slight effect."  Therefore, we conclude
> that the improper admission of the notes was not harmless, and
> constitutes an additional ground upon which to vacate the
> defendants' conspiracy and attempt convictions.

Id. at 172 (internal quotations and citations omitted).  The Court further concluded that this

"serious error," in combination with other evidentiary errors, "deprived [the] defendants of a fair

trial," and "denied [them] due process of law."  Id. at 172, 178.  Recognizing the "probable

force" that the other admitted evidence "may have had," the Court emphasized that the wrongly

admitted notes nevertheless "[went] to the heart of the case," "buttressed Al-Anssi's testimony

on key points that were unquestionably central to the charge," and "were of considerable

significance in relation to everything else the jury considered."  Id. at 170-71 (internal quotation

and citations omitted).  Finally, the Court understood, as the Supreme Court had explained in

Chambers, that fundamental fairness concerns are implicated when the defendants' defense is

impaired:  because "[i]mpeaching Al-Anssi's credibility was important to the defendants'

entrapment defense," id. at 154, the Court appreciated the specific unfairness that lay in "the fact

that [the notes] buttressed the testimony of a witness whose credibility had otherwise been

severely damaged," and concluded that "the notes cannot be viewed as simply cumulative of [the

witness's] testimony" precisely because it was the damaged credibility "[that] the government

attempted to remedy by introducing the notes."  Id. at 169, 171.  The Court thus concluded that

"the district court's error in admitting the notes was not harmless as to predisposition and

therefore the entrapment defense, and constitutes an additional ground for vacating the

defendants' convictions." Id. at 171.

A significant pre-Tome case is United States v. Quinto, 582 F.2d 224 (1978), where the Second Circuit had likewise found that the improper admission of an impeached witness's prior consistent statement denied the defendant his right to a fair trial. The facts and reasoning are highly instructive. Michael Quinto acknowledged that he had failed to report certain income; in his trial for tax evasion, therefore, the government's proof was directed to the element of willful intent. The principal evidence was the testimony of IRS Special Agent James Wallwork, and the "crucial portion" of that testimony concerned Wallwork's interview of Quinto. Id. at 227. As summarized in the Circuit's opinion, Wallwork testified that, "after some abortive attempts to extricate himself from his obvious predicament," Quinto "blurted out: 'Okay, I was trying to screw the government out of some cash if I could.'" Id.

After the defense conducted "a vigorous" cross-examination of Walker intended to show that the interview "had been more of an inquisition than an interview," id., the government on redirect offered a memorandum Wallwork had prepared following his interview with Quinto. The document "consist[ed] of eight single-spaced, typed pages" and "purported to describe exactly what had happened at Quinto's session with the agents," including Quinto's having stated that he had been trying to "'screw the government out of cash if (he) could.'" Id. at 229. The government argued that because there had been "a general attack on the agent's credibility," the document was admissible as substantive evidence under FRE 801(d)(B). Although the trial court initially sustained the defense objection, the trial judge himself re-opened the matter after the defense rested and admitted the document for its substance, after which it was distributed to each of the jurors and "taken by them into the jury room when they retired to deliberate Quinto's fate." Id. at 232.

On the evidentiary question, the Second Circuit "h[e]ld that the memorandum should have been excluded regardless of whether it was offered for the truth of the matters asserted therein or merely for the more limited purpose of rehabilitating the in-court testimony of Agent Wallwork" because the pre-motive requirement was not satisfied.  Id.  More specifically, the Court found that "[t]he various improper motives the defense vigorously asserted the IRS agent might have had for lying on the witness stand [were] reducible essentially to a claim that, regardless of Quinto's actual guilt or innocence, throughout the entire investigation the government agents were ruthlessly seeking a conviction, presumably to enhance their own professional enhancement and aggrandizement," and that "the deeply rooted prejudice which Quinto claims was motivating the agents' actions existed both at the time the memorandum was compiled and at the time of Quinto's trial."  Id. at 234.

The Second Circuit recognized that the defect lies in the fact that the purported rehabilitation was not tailored to the impeachment: as the Court explained, in deciding whether to believe Wallwork, "it cannot help us . . . to know [merely] that [Wallwork] has asserted the same thing previously.  If that were an argument, then the witness who has repeated his story to the greatest number of people would be the most credible."  Id. at 235.

Turning to the question of trial unfairness, the Court in Quinto "d[id] not hesitate to decide" that the evidentiary error "necessitates reversal."  Id.  Applying the Kotteakos test, the Court concluded:

> Here it is a virtual certainty that the eight-page single-spaced IRS report substantially influenced the jury to convict Quinto. The more official and authoritative a writing appears to be, the less likely it is that even cautious or cynical individuals will be able to resist the temptation to regard the accuracy of the contents of the document as being beyond reproach. The memorandum which the IRS agents prepared following their interview with Quinto is, to say the least, impressive in appearance. Indeed, the specificity with

which the document relates the entire course of the interview, the questions propounded by the interrogators and Quinto's responses to those inquiries, leads us to believe that it would indeed be the unusual juror who would be unimpressed and uninfluenced by the memorandum or who would be at all dubious that Quinto had been treated solicitously or that he actually had confessed that he was "trying to screw the government out of some cash if (he) could." In fact, we have little doubt that once the jury had retired to the privacy of their deliberations, the document which we have held to have been improperly admitted probably became the single most important piece of evidence, testimonial or documentary, against Quinto, for "(t)he jury thus had before it a neat condensation of the government's whole case against the defendant. The government's witnesses in effect accompanied the jury into the jury room. In these circumstances we cannot say that the error did not influence the jury, to the defendant's detriment, or had but very slight effect." Moreover, the error is not rendered harmless by the fact that IRS "agents had testified and were cross-examined on the same subjects." Finally, this was a case in which, on both the tax evasion and false swearing charges, the issue of paramount importance was whether the defendant had acted with willful intent. Of course, if the jury believed that Quinto had really stated that his purpose in not reporting income had been "to screw the government out of some cash," Quinto, for all practical purposes, could not possibly have hoped for acquittals on any of the charges. Although Wallwork testified that Quinto had made such a crucial admission, the jury might not have credited the agent's in-court testimony. It is difficult for us to believe, however, that the jury could have ignored the elaborate IRS memorandum which was improperly introduced into evidence and, unfortunately for Quinto, this document was all the jury really needed to see to conclude that Quinto had indeed acted willfully in violating the Internal Revenue laws.

Id. at 235-36 (internal citations omitted).

In addition to tying its analysis to the Kotteakos harmless-error test, the Court in Quinto also framed its holding in due process terms.  See id. at 226 ("Inasmuch as we agree with Quinto that the district court erred by admitting the memorandum as a prior consistent statement under Fed.R.Evid. 801(d)(1)(B) and that the court's erroneous admission of the document severely prejudiced Quinto's right to a fair trial, we reverse the judgment order of conviction and remand

for a new trial on all counts of the indictment.").[17]

In sum, Tome, Al-Moayad and Quinto illustrate that correct application of the pre-motive requirement prevents unconscionable prosecutorial windfalls and insurmountable defense disadvantages.  In each of those cases, the performance of the state's key witness was significantly impeached (Al-Moayad, Quinto) or otherwise problematical (Tome), and the prosecution's attempted remedy, under the guise of rehabilitation, was to offer a hearsay version of the disappointing trial testimony that had so much more jury appeal than the in-court testimony—either because, as in Tome, a child's hesitant account was re-packaged in the far more coherent and authoritative voices of the adults in her life, or because, as in Al-Moayad and Quinto, seemingly speculative oral assertions were re-told in the far more authoritative and credible form of comprehensive *documents*—that what occurred on the stand was essentially supplanted by the improperly admitted hearsay.  Whenever the prosecution knows it can replace poor trial testimony with a script or some other "better" prior account, it is essentially relieved of actually having to "try" that portion of its case.

Additionally, the erroneously admitted hearsay rendered the trials unfair because in each case the hearsay essentially nullified what had been the principal defense theory.  See Chambers, 410 U.S. at 294 ("[t]he right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations," and that due process is denied when trial error renders the defense theory "far less persuasive" that it otherwise would have been).  It is precisely for that reason that the *erroneous* admission of *corroborative* hearsay is so dangerous; when assessing such an error for harmlessness or for its overall effect on the

---

[17] Non-Second Circuit law is in accord.  See, e.g., United States v. Lozada-Rivera, 177 F.3d 98, 104 (1st Cir. 1999) (error to admit DEA agent's report as prior consistent statement because impeachment of witness went to credibility generally and did not charge recent fabrication; conviction reversed).

trial, it is tempting to note that the erroneously admitted evidence did in fact tend to substantiate the impeached testimony and weigh that *against* a finding of unfairness or harmful error. But as the Second Circuit recognized in <u>Al-Moayad</u>, admission of the agent's notes was unfair specifically because of "the fact that [the notes] buttressed the testimony of a witness whose credibility had otherwise been severely damaged." 545 F.3d at 169. For that reason "the notes c[ould not] be viewed as simply cumulative of [the witness's] testimony," since it was the damaged credibility "[that] the government attempted to remedy by introducing the notes." <u>Id.</u> at 171. In short, manifest injustice arises when an out-of-court statement admitted to rehabilitate an impeached witness suffers from the same bias it is introduced to rebut: the mere "[r]epetition of a lie," Barker & Alexander at §6:41, functions like confirmation of the truth.

### B.      Analysis: The Principal Evidentiary Error

Under the foregoing authorities, I readily conclude, as did the Appellate Division, that the trial court erred when it admitted Walker's narrative for its substance on the grounds announced, *viz,* "to the extent that [Walker's] testimony . . . has been attacked as a recent fabrication, I'll allow this to go in as a prior consistent statement. That's the exception to the rule against bolstering." (T. 832).

First, the trial court mischaracterized the nature of the impeaching attack lodged against Walker's testimony. In admitting the hearsay narrative "to the extent that [Walker's] testimony . . . has been attacked as a recent fabrication," the trial court failed to apprehend that Walker's testimony was attacked not only in that limited way, but was appropriately impeached on far more general and sweeping grounds. As the record makes plain, the driving force of the cross-examination was the magnitude of Walker's persistent, conscious and compunctionless

fictionalizing to police.[18]  Within that context, defense counsel of course addressed Walker's role

as a cooperator, see T. 107-12, 143, but as noted, did so principally to advance the theory that

Walker's trial testimony was *yet another* instance of Walker's general proclivity to lie to serve

her own interests:

> By counsel for petitioner:

> Q.    So basically now what you are doing on the stand is you're avoiding five years
> imprisonment by telling another version of the story different from the three
> versions you have told before; is that correct?

> A.    No, it is not. I'm telling the truth.

> Q.    But whenever it was in your interest before you told whatever you felt like to get
> out of jail and this is getting you out of a jail sentence?

> A.    Yes it is.  (T. 143).

> By counsel for co-defendant Merzier:

> Q.    So, it suits your interest to enter into a deal and testify at this trial against
> [Merzier] and [petitioner]?

> *(Objection interposed and overruled).*

> A.    Yes.

> Q.    Just like it suited your interest when you spoke to Officer Hecht, when it suited
> your interest when you talk[ed] to Detective Ahern, it suited your interest when
> you talk[ed] to Rivera and statements all of which were in fact not true?

> *(Objection interposed and sustained).*  (T. 111-112).

Thus, because the basis of impeachment was Walker's *general proclivity* to lie,

rehabilitation by prior consistent statement was not appropriate, particularly when, as here, the

prior statement was itself not entirely true.  See generally Barker & Alexander at § 6:41 ("[P]rior

consistent statements are not particularly probative of credibility where impeachment of the

---

[18] A considerable portion of the cross also focused on the content of Walker's account of
the events in question and sought to discredit it by exposing its logical and contextual gaps.

witness is general in nature, such as [bias], bad character for truthfulness or prior inconsistent statement.") (collecting authorities).[19]

Assuming further that the portion of the cross that addressed Walker's cooperation agreement could support a "recent-fabrication"-based analysis, the admitted document would still not satisfy the temporality precondition for admission: as the Appellate Division concluded, the statement was "not made at a time when [Walker] had no motive to lie." Evans, 16 A.D.3d at 518. To the contrary, as the Appellate Division found, "Walker had a motive to falsify at the times she gave each of her statements to police officers, namely, to avoid complicity in the burglary and, hence, arrest, as well as at the time of trial." Id. The prior out-of-court statement, therefore, was as compromised and unreliable as the discredited trial testimony it was admitted to authenticate.

The error that occurred at petitioner's trial reflected a grave mishandling of the "pre-motive to fabricate" requirement. The fact that a statement is made when its declarant is known to have been possessed of a motive to fabricate taints but the statement's veracity but does not establish its actual falsity. But Walker's statement was, according to the state's own account, actually false, at least in part. To recap: the state elicited from Walker, on direct, the fact that she had previously given several statements to police about the events addressed in her testimony that were inconsistent with that testimony; the assertion that her trial testimony is to be believed necessarily asserts that the statements inconsistent with it were not entirely true. The state further elicited from Walker the fact that she wrote up one of these not-entirely-true prior

_____

[19] To be sure, the trial court's ruling begins with language of apparently limiting import (i.e., it allows the document "*to the extent that*" Walker's testimony was attacked as a recent fabrication), which suggests that the court did appreciate that Walker's testimony was attacked on other grounds as well. But the qualifying language did not limit the reach of the decision; i.e., the court did not admit only a limited portion of the document or allow the document for only a limited purpose.

inconsistent statements shortly after delivering it orally.  By the state's and Walker's own characterization, therefore, the written narrative was actually untrue (at least in part) and not merely at risk of being so.  Indeed, the document admitted for its corroborative value was, according to this same evidence, the written version of one of the very prior statements with which Walker was impeached.

### C.      Analysis: Additional Error

Prior consistent statement jurisprudence of course presupposes the *consistency* of the prior statement with the impeached trial testimony or at least some redaction of the offered statement to the portions that are consistent.  As the record here demonstrates, however, Walker's narrative, in its unredacted form, was *in*consistent with Walker's testimony in the material ways already discussed, and so was not even eligible for consideration as a prior consistent statement.   A generally similar state of affairs appears to have been present in Tome, Al-Moayad and Quinto—i.e., that is, in each of those cases, the wrongly admitted hearsay was of greater length or quantity than the trial testimony it replaced—but none directly addresses the question of *inconsistency*.[20] But the record here contains a factor not present in those cases that does require brief attention to the question of inconsistency: the fact that, in the course of the admission colloquy, the prosecution first conceded the document's *in*consistency with Walker's testimony.

---

[20] Tome notes the contrast between the impeached testimony of the single child witness and the "parade" of rebuttal witnesses but also states that the witnesses "did no more than recount [the victim's] detailed" account; Al-Moayad remarks that the wrongly admitted agent notes *both* "contained much of the government's strongest, most direct evidence . . . *and* significantly buttressed [the agent's] trial testimony," but does not inventory the evidence found only in the notes; and Quinto, by underscoring the comprehensiveness of the wrongly admitted interview memorandum, likewise conveys clearly but only generally the fact that the wrongly admitted memorandum had more information in it than the agent's testimony, without discussing directly the inconsistency between the document and the testimony.

As a threshold matter, this fact alone renders the trial court's decision to admit the writing as a prior *consistent* statement—without redaction or a qualifying instruction—even more suspect.  It is also a clue to the state's real objective in offering the statement, namely, to replace rather merely to rehabilitate Walker's substantially impeached in-court performance.  The fact also accounts for the state's continued advancement, on appeal and here, of the theory that it had the right to seek to *correct* its own witness's testimony through impeachment with a prior *in*consistent statement presenting the additional damaging details, discussed above, that are found *only* in the statement but not in the trial testimony.

The principles that allow a party to impeach its own witness plainly do not contemplate what occurred at petitioner's trial.  <u>See</u> <u>generally</u> N.Y. Crim. Proc. Law § 60.35 ("When, upon examination by the party who called him, a witness in a criminal proceeding gives testimony upon a material issue of the case which tends to disprove the position of such party, such party may introduce evidence that such witness has previously made either a written statement signed by him or an oral statement under oath contradictory to such testimony.").  <u>Cf.</u> Fed. R. Evid. 607 ("The credibility of a witness may be attacked by any party, including the party calling the witness.").  But, the prosecution did not declare its purpose to be one of "impeachment," either to the court (when offering the document) or to the jurors (when urging them to rely on it in their deliberations), and so it is no surprise that there was not even an attempt to make the requisite showing under CPL § 60.35 that Walker gave testimony "upon a material issue" that "tend[ed] to disprove" the state's position. [21]

---

[21]  The third theory advanced by the state, that petitioner "opened the door" on cross-examination, requires little discussion.  "The 'opening the door' principle of admissibility allows a party to introduce otherwise inadmissible evidence 'when the opposing party has introduced inadmissible evidence on the same issue.'" <u>United States v. Kaiser</u>, 609 F.3d 556, 572 n.4 (2d Cir. 2010) (internal quotation and citation omitted).  The Appellate Division correctly concluded that the document "should [not] have been admitted on the theory that [petitioner] opened the

#### D.      Fundamental Unfairness

As noted, the authorities discussed above, in delineating the applicable evidentiary

principles, also explain the seriousness of the error that may arise when these principles are

misapplied and the unfairness such errors may create.  Little additional discussion, therefore, is

required to elucidate the fundamental unfairness of petitioner's trial.  Like the child in Tome,

agent Al-Anssi in Al-Moayad and IRS Agent Wallwork in Quinto, Aisha Walker was the

prosecution's critical witness.  Indeed, Walker was the linchpin, for unless the jury believed her,

the remaining evidence, all circumstantial, was innocuous.[22]  But Walker's testimony, like that of

---

door, in order to permit fleshing out [of] the statement on the ground that only a misleading
portion of the statement had been used on cross-examination."  Evans, 16 A.D.3d at 519.
Indeed, it was the prosecution who first elicited from Walker, during direct, the fact that after
speaking with Rivera she later wrote down what she had told him orally, and as the Appellate
Division correctly found, petitioner "carefully avoided any questions aimed at the content of the
statement Walker gave to Detective Rivera."  Id.   The Appellate Division further recognized that
the "opening the door" theory was "a second conflicting ground" offered only to "rationalize"
admission of the statement.  Id. at 518.

[22] Among other things, none of the witnesses made an identification; there was no
physical evidence (fingerprints, DNA, or videotapes) linking petitioner to Omitogun's apartment
or the items found there; and the smeared bootprint taken from the terrace of the apartment
neighboring Omitogun's—the only physical evidence purporting to link petitioner to the crime
scene—could have been made by any boot manufactured by Timberland or any of the other
brands that use that common tread pattern.  Of course, there is the fact that petitioner was found
at Walker's apartment five hours after the burglary and the fact that, during a subsequent search
of the apartment two hours after petitioner's removal, police discovered weapons, clothing, and
the proceeds of the crime; nevertheless, those items were not found in open view, and there was
no surveillance or securing of the apartment during the several time gaps (between the time of
the crime and petitioner's discovery, or between that event and the subsequent discovery of the
proceeds and weapons).

Respondent, pointing to this same body of "other evidence," argues, as the Appellate
Division concluded, that even without Walker's statement there was overwhelming and/or
legally sufficient evidence of guilt. The argument is unpersuasive.  Principally, as reviewed
above, the due process materiality/prejudice inquiry is not a sufficiency of the evidence test, but
instead focuses on the magnitude and effect of the error under review.  Kyles, 514 U.S. at 434-
35.  In any event, when focusing on the state of the evidence, respondent fails to appreciate that
the proper question is not how much other evidence was there without Walker's statement, but
rather, how much of a case was there without Walker.  As the prosecution no doubt understood

the child in <u>Tome</u>, was also of "[some] concern[ ]," 513 U.S. at 153, and, like that of the agents

in the other cases, impeached through "significant," <u>Al-Moayad</u>, 545 F.3d at 154, and

"vigorous," <u>Quinto</u>, 582 F.2d at 227, cross-examination.  Indeed, the impeaching of Walker was,

like the impeaching of Al-Anssi in <u>Al-Moayad</u> and of agent Wallwork in <u>Quinto</u>, *the* principal

defense theory.  And the admission of Walker's narrative, like the admission of Al-Anssi's notes

and of Quinto's notes, nullified that principal defense by undoing all the damage the defense had

done to the key witness's credibility.  See <u>Al-Moayad</u>, 545 F.3d at 170-71; <u>Quinto</u>, 582 F.2d at

236.   The importance of the credibility of a prosecution's key witness cannot be emphasized

enough: as the Second Circuit recognized in both <u>Al-Moayad</u> and <u>Quinto</u>, there was no dispute

that the agents in question offered testimony that, *if believed*, was damaging, but in both cases,

the defense impeachment had elicited sufficient bases for the juries to decline to credit that

testimony.  See <u>Al-Moayad</u>, 545 F.3d at 169 (recognizing the unfairness in "the fact that [the

erroneously admitted notes] buttressed the testimony of a witness whose credibility had

otherwise been severely damaged"); <u>Quinto</u>, 582 F.2d at 236 (recognizing that without the

wrongly admitted interview memorandum, "[a]lthough Wallwork testified that Quinto had made

[ ] a crucial admission, the jury might not have credited the agent's in-court testimony").

The same is true of petitioner's trial.  There is no dispute that much of what Walker

testified to, if believed, was damaging, nor is there any dispute that, as the Appellate Division

noted, much of what is in Walker's narrative "confirm[s] Walker's testimony implicating him."

<u>Evans</u>, 16 A.D.3d at 519.  But lying precisely within the Appellate Division's observation is its

misapprehension of the issue, i.e., that fundamental unfairness results when corroborating

statements that should *not* have been admitted are nevertheless free, because they *have* been

_____

at the time it was offering the hearsay statement, without that statement, there was a serious risk
that Walker's direct account would not be credited.

admitted, to work their illegitimate magic.  The trial defense that rests upon impeachment is rendered a nullity, the near mortally wounded key witness—and, by extension, the precarious prosecutorial case—is resurrected and, through the alchemy of repetition and substitution, unreliable testimony plus unreliable hearsay somehow becomes, for jurors, virtually irrefutable truth.

As in the trials of Matthew Tome, Muhammed Al-Moayad and Michael Quinto, the erroneously admitted hearsay in petitioner's trial, because of its highly jury-friendly documentary nature, essentially stole the show; i.e., it so outshone the testimony it was purportedly rehabilitating that it essentially supplanted that testimony.  Indeed, much of what the Second Circuit said of the wrongly admitted interview memorandum in Quinto applies with equal force to Walker's narrative.  Although her statement is not, like IRS agent Wallwork's memorandum, an "official" document, it is nevertheless "impressive" in its comprehensiveness and diary-like effusiveness, and the "specificity with which [it] relates the entire course" of affairs makes it appear to be accurate "beyond reproach."  Quinto, 582 F.2d at 235.  I am convinced that "it would indeed be the unusual juror who would be unimpressed and uninfluenced" by Walker's narrative, id., and cannot avoid concluding, as in Quinto, that "[t]he jury [ ] had before it a neat condensation of the government's whole case against the defendant," and that "[t]he government's witnesses in effect accompanied the jury into the jury room."  Id. at 236.  In short, like Wallwork's memorandum in Quinto, Walker's statement "was all the jury really needed to see to conclude" that petitioner was guilty.  Id.  At the very least, it is clear that, like Al-Anssi's notes in Al-Moayad, Walker's statement "[went] to the heart of the case" and was "of considerable significance in relation to everything else the jury considered," notwithstanding the arguable "probative force" that some of the other evidence in the case "may

have had."   Al-Moayad, 545 F.3d at 170-71 (internal citations and citations omitted).  See also

Lozada-Rivera, 177 F.3d at 105 ("[a]lthough [erroneously admitted DEA agent's report] largely

tracked [the agent's] own in-court testimony, it essentially provided the jury with an authoritative

'condensation of the government's whole case'") (quoting Quinto, 582 F.2d at 236).

     Additionally, I return to the fact that Walker's narrative was both consistent and

inconsistent with her testimony in the ways already discussed,[23] and to the state's disturbing

assortment of arguments during the admission colloquy.   As noted, the state had insisted that the

trial court did not even need to examine the document before admitting it, and advanced the

unusual assertion that the statement was admissible because it was both consistent and

inconsistent with Walker's trial testimony.  No extant evidentiary principles correspond to these

fantastic notions, but in the act of advancing them the state essentially gave itself away.  It is

clear that state's offer, coming as it did near the close of the case, ultimately had less to do with

prior consistent and prior inconsistent statements or efforts to assist the jury with assessing the

credibility of a witness, and everything to do with presenting the jury with a cogent and logical

description of the genesis and culmination of the criminal venture.  With the trial approaching its

close, prosecutors recognized that their star witness had delivered a very disappointing

performance, that they had chosen not to try to rehabilitate her during redirect, and that unless

she was believed, they would lose.  So they offered a document to supplant that testimony.  The

maneuver is irreconcilable with the basic fairness inherent in the concept of due process.

---

[23] As noted, the written statement supplemented Walker's in-court testimony by
furnishing additional damaging evidence that either she neglected to offer or prosecutors
neglected to ask her while she was on the stand.  Although Walker testified that the idea of
robbing Omitogun originated with Foster, in her narrative she states that even before the meeting
with Foster, petitioner himself expressed a desire to rob Omitogun; the narrative, but not her
testimony, also places petitioner on the other end of a telephone call made from inside
Omitogun's apartment at the time of the robbery.

For all the reasons discussed, I further conclude that, as in Tome, as well as in Al-Moayad and Quinto, the wrongly admitted hearsay caused the "whole emphasis of [petitioner's] trial [to] shift" from the in-court statements to those made elsewhere.  Tome, 513 U.S. at 165. Indeed, although petitioner was convicted in the courtroom, the real trial occurred in the police precinct where Walker composed the unsworn account that furnished the narrative quality, precision, and detail that were simply beyond detection in the courtroom.  A proceeding whose basic functioning is so thwarted cannot be considered the "trial" guaranteed by the Constitution. Cf.  Strickland, 466 U.S. at 687 (test for counsel's ineffectiveness requires showing, *inter alia*, that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment").

The Appellate Division's failure to recognize the manifestly prejudicial effects of the trial court's erroneous admission of Walker's statement, and its decision to allow a conviction to be secured through hearsay in the manner described in this Memorandum, is an objectively unreasonable application the due process principles "embodied,"  Thaler, 130 S.Ct. at 1173, in the Supreme Court holdings in  Estelle, Lisbena, and Dowling.  It was objectively unreasonable for the Appellate Division to fail to recognize, as the reviewed evidentiary authorities make clear and the decisions in Tome, Al-Moayad and Quinto powerfully illustrate, that the kind of evidentiary error that occurred in petitioner's trial is "extremely unfair," Dowling, 493 U.S. at 352, that it "infused the trial with unfairness," Estelle, 502 U.S. at 75, and "fatally infected" the proceedings.  Lisbena, 314 U.S. at 236.  The Appellate Division's decision is also an unreasonable application of Chambers:  the state appellate court failed to apprehend that the cumulative nature of the errors embedded in the single evidentiary ruling and their cumulative

effect rendered petitioner's trial unfair, 410 U.S. at 302;[24] it failed to discern that admission of

the hearsay narrative nullified petitioner's defense (or at the very least, rendered it "far less

persuasive than it might [otherwise] have been"), id. at 294; and, at bottom, it failed to recognize

that, because "no rule of evidence has been more respected and more frequently applied in jury

trials than that applicable to the exclusion of hearsay," that a conviction based principally on

hearsay is not reconcilable with basic conceptions of justice.  Id. at 302.[25]

---

[24] The embedded and accumulated errors and effects include, as has been discussed:  (i) the admission of a document that the prosecution admitted was both inconsistent and consistent with the trial testimony, when the document in fact satisfied *neither* the test for prior consistent nor prior inconsistent statements; (ii) the fact that the state's attempt to simultaneously impeach and rehabilitate its own witness with a single document should have alerted the court to the fact that it was attempting to accomplish the illegitimate objective of *replacing* its witness's testimony altogether; (iii) the fact that the state's decision to offer the statement near the close of the trial, rather than on Walker's re-direct, should likewise have alerted the court to the state's improper motives; (iv) the court's failure to redact the document to conform to the stated grounds of admission; (v) the court's failure to give any sort of limiting instruction; (vi) the prosecution's touting of Walker's narrative during summation; and (vii) the furnishing of the wrongly admitted documents to jurors during deliberations.

[25] For all the same reasons, I would also conclude, were it necessary to do so, that the state appellate court unreasonably applied the Collins/Agurs test.   See note 12 *supra*.  As noted, under Collins, for an evidentiary error to rise to the level of a due process violation, it must be shown that the wrongly admitted evidence, "viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it."  Collins, 755 F.2d at 19 (emphasis added) (citing Agurs,  427 U.S. at 112).   "In short," the Court concluded, "[the erroneously admitted evidence "must have been 'crucial, critical, highly significant.'"  Collins, 755 F.2d at 19 (internal citation omitted).  The Agurs "materiality" standard, as the Supreme Court subsequently made clear, "is *not* a sufficiency of evidence test."  Kyles, 514 U.S. at 434 (emphasis added).  Instead, the "touchstone of materiality [under Agurs and its progeny] is a 'reasonable probability' of a different result," id., which means that a habeas court is to examine whether the wrongly excluded or improperly admitted evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  Id. at 435.  "The possibility of an acquittal on a criminal charge," the Court explained, "does not imply an insufficient evidentiary basis to convict."  Id.   The emphasis, in short, is on the integrity of the process: "[t]he question is not whether the defendant would more likely than not have received a different verdict with[out] the evidence, but whether in its [presence] he received a fair trial."  Id. at 434.

E.       **Harmless Error**

Authorities sensibly conclude that, because both harmless error and due process inquiries look at the overall effect of an error on the trial and verdict, analysis under either doctrine tends to subsume analysis under the other.[26]   Under this view, where trial error is serious enough to satisfy the prejudice/unfairness component of the due process test, the error would necessarily be *not* harmless under Kotteakos and Brecht v. Abrahamson, 507 U.S. 619 (1993).

Nevertheless, in Fry v. Pliler, 551 U.S. 112 (2007), the Court "granted certiorari to decide . . . whether [which of two earlier decisions] provides the appropriate standard of review when constitutional error in a state-court trial *is first recognized* by a federal court," id. at 120 (emphasis added), and "h[e]ld that in §2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious

---

For the reasons delineated throughout this Memorandum, it would have been an unreasonable application of Collins/Agurs/Kyles for the Appellate Division to have concluded that Walker's statement was not "crucial, critical [and] highly significant" and that, by replacing Walker's in-court performance, it did not remove a reasonable doubt that would otherwise have existed.

[26] A representative articulation of the view is the following:

 harmless error analysis is simply inapplicable to [trial] error that only attains constitutional significance when considered in the context of the entire trial because such analysis inheres in the initial finding that the error was constitutionally significant.  A determination that such error was not harmless, after having already concluded that it denied the defendant a fundamentally fair trial, would be tautological.

Dey v. Scully, 952 F. Supp. 957, 974 (E.D.N.Y. 1997) (Block, J.). See also Spears v. Mullen, 343 F.3d 1215, 1229 n.9 (10th Cir. 2003), cert.denied, 541 U.S. 909 (2004) (due process error obviates need for harmless error analysis); King v. Greiner, 2008 WL 4410109, at *58 (S.D.N.Y. Sept. 26, 2008) (Cote, J.) (same); Roman v. Filion, 04-CV-8022, 2005 WL 1383167 (S.D.N.Y. June 10, 2005) (same).  Cf. Hill v. Lockhart, 28 F.3d 832, 839 (8th Cir. 1994) ("[I]t is unnecessary to add a separate layer of harmless-error analysis to an evaluation of whether a petitioner in a habeas case has presented a constitutionally significant claim for ineffective assistance of counsel.").

effect' standard [of <u>Brecht</u>] whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard [of <u>Chapman</u>]." <u>Id.</u> at 121-22.

On the facts of this petition, the harmless error and due process analysis are essentially the same, but to the extent that <u>Fry</u> so requires, I make here the separate finding, for the reasons already discussed, that the constitutional error that occurred at petitioner's trial had a "substantial and injurious effect or influence in determining the jury's verdict." <u>Kotteakos</u>, 328 U.S. at 776. Indeed, for all the reasons set forth in this Memorandum, I "cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error," and so "it is impossible to conclude that substantial rights were not affected." <u>Id.</u> at 765.  <u>See also</u> <u>O'Neal v. McAninch</u>, 513 U.S. 432, 435 (1995) (when a court is "in virtual equipoise as to the harmlessness of the error" under the <u>Kotteakos</u> standard, the court should "treat the error . . . as if it affected the verdict").

## CONCLUSION

For all of the foregoing reasons, petitioner's application for a writ of habeas corpus is granted.  Within ninety (90) days of the entry of judgment, respondent shall either retry petitioner or release him.  The judgment shall be stayed upon the timely filing of a notice of appeal and any such stay shall remain in effect until all federal appellate proceedings are completed.

SO ORDERED.

Dated: Brooklyn, New York
      September 22, 2011                                        s/ Judge Raymond J. Dearie

                                                             _____
                                                            RAYMOND J. DEARIE
                                                            United States District Judge